**EXHIBIT 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 19-cr-00435-CMA

UNITED STATES OF AMERICA,

       Plaintiff,

v.

1. YAGUANG QI,
  a/k/a "JAMES QI,"

       Defendant.

---

## PLEA AGREEMENT
---

The United States of America (the government), by and through Anna Edgar, Assistant United States Attorney for the District of Colorado, and the defendant, Yaguang Qi, personally and by counsel, Lawrence Hill, submit the following Plea Agreement pursuant to D.C.COLO.LCrR 11.1.

## I.   AGREEMENT

This agreement is submitted to the Court for its consideration pursuant to Rule 11(c)(1)(A) and (B) of the Federal Rules of Criminal Procedure.

### *Defendant's Obligations*

<u>Guilty Plea</u>

1.      The defendant agrees to plead guilty to Count 2 of the Indictment,

charging a violation of Title 21, United States Code, Sections 331(a) and 333(a)(2),

Introduction into Interstate Commerce of a Misbranded Drug, and aiding and abetting

the same, in violation of Title 18, United States Code, Section 2.

<u>Appellate Waiver</u>

2.      The defendant is aware that Title 18, United States Code, Section 3742

affords the right to appeal the sentence, including the manner in which that sentence is

determined.  Understanding this, and in exchange for the concessions made by the

government in this agreement, the defendant knowingly and voluntarily waives the right

to appeal any matter in connection with this prosecution, conviction, or sentence unless

it meets one of the following criteria: (1) the sentence exceeds the maximum penalty

provided in the statute of conviction; (2) the sentence exceeds the advisory guideline

range that applies to a total offense level of 10; or (3) the government appeals the

sentence imposed.  If any of these criteria apply, the defendant may appeal on any

ground that is properly available in an appeal that follows a guilty plea.

3.      The defendant also knowingly and voluntarily waives the right to challenge

this prosecution, conviction, or sentence in any collateral attack (including, but not

limited to, a motion brought under Title 28, United States Code, Section 2255).  This

waiver provision does not prevent the defendant from seeking relief otherwise available

in a collateral attack on any of the following grounds: (1) the defendant should receive

2

the benefit of an explicitly retroactive change in the sentencing guidelines or sentencing statute; (2) the defendant was deprived of the effective assistance of counsel; or (3) the defendant was prejudiced by prosecutorial misconduct.  If the government appeals the sentence imposed by the Court in this case, the defendant is released from this waiver provision.

Cooperation

4.      In consideration for the concessions made by the government in the plea agreement, the defendant agrees to provide truthful, complete and accurate information, and agrees to cooperate fully with the government.  This cooperation will include, but is not limited to, the following:

a.      The defendant agrees to be fully debriefed, and to attend all meetings at which his presence is requested, concerning his participation in, and knowledge of, all criminal activities.

b.      The defendant agrees to furnish to the government all documents and other material that may be relevant and that are in the defendant's possession or control.

c.      The defendant agrees to testify fully and truthfully at any proceeding in the District of Colorado or elsewhere as requested by the government. This extends to providing testimony about all information the defendant knows.

d.      The defendant agrees he will at all times give complete, truthful, and accurate information and testimony and will fully and truthfully disclose all

information with respect to the activities of himself and others concerning all matters about which the government inquires.

        e.      The defendant agrees that if the government can show that he lied or attempted to mislead the government or law enforcement authorities, or if he does not fulfill the terms of or does not complete his cooperation under this agreement, he is in breach of this plea agreement, and the government reserves the right to prosecute him for perjury or false statement, to withdraw its agreement in this case, and to bring any additional charges, including those that the government agreed to dismiss in connection with this plea agreement.  If the government alleges such conduct, it will have the burden of establishing the alleged conduct at a separate hearing by a preponderance of the evidence.

Effect of Vacatur

        5.      Should the defendant's plea of guilty be vacated for any reason on motion of the defendant, the government may, in its sole discretion, file any charges against the defendant that were within the statute of limitations on the date of the defendant's guilty plea entered pursuant to this agreement.

***Government's Obligations***

Acceptance of Responsibility Recommendation

        6.      Provided the defendant does nothing inconsistent with accepting responsibility between the date of his guilty plea and the date of sentencing, the government will recommend that the defendant receive the maximum reduction for acceptance of responsibility.

<u>No Further Charges</u>

7.      The United States Attorney's Office for the District of Colorado agrees not to pursue any additional charges against the defendant based on conduct known to the United States Attorney's Office for the District of Colorado at the time of the defendant's change of plea hearing.

<u>Sentencing</u>

8.      The defendant is currently detained.  The government agrees to file a Motion for Downward Departure based on Section 5K1.1 of the U.S. Sentencing Guidelines and to recommend a sentence of imprisonment of time served with one year of supervised release.

## II.  ELEMENTS OF THE OFFENSE

9.      The parties agree that the elements of the offense to which this plea is being tendered are as follows:

   i.   The defendant introduced or delivered for introduction in interstate commerce, or caused introduction or delivery for introduction in interstate commerce, an item on or about the date noted in the indictment.

   ii.  The item was a drug.

   iii. The item was misbranded in at least one of the following respects: (a) because it did not bear adequate directions for its use, or (b) it was false or misleading.

   iv.  The defendant acted with intent to defraud or mislead regarding the misbranding.

*United States v. Patwardhan*, 08-cr-172 (C.D. Cal. May 8, 2009) (jury instructions).

10.     A drug can be "misbranded" in multiple ways, two of which are relevant here. First, the law requires that each drug be accompanied by "adequate directions for use." 21 U.S.C. § 352(f)(1).  FDA regulations define "adequate directions for use" as directions under which a layman can safely use a drug for its intended uses.  21 C.F.R. § 201.5.  Second, the law prohibits a drug's labeling from being "false or misleading in any particular."  21 U.S.C. § 352(a).

11.     The Federal Food, Drug, and Cosmetic Act ("FDCA") defines a "drug" to include "articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man," and "articles (other than food) intended to affect the structure or any function of the body of man."  21 U.S.C. § 321(g)(1)(B), (C).

12.     The FDCA defines interstate commerce as "(1) commerce between any State or Territory and any place outside thereof, and (2) commerce within the District of Columbia or within any other territory not organized with a legislative body."  21 U.S.C. § 321(b).  Thus, "interstate commerce" includes foreign commerce when a product is shipped from outside the country to a State or Territory.

13.     "Intent to defraud" means intent to deceive or cheat someone. In the context of an FDCA violation, the defrauded party may be a consumer or a government agency. *United States v. Micheltree*, 940 F.2d 1329, 1348 (10th Cir. 1991); *United States v. Scully*, 170 F. Supp. 3d 439, 470–71 (E.D.N.Y. 2016).

### III.  STATUTORY PENALTIES

14.     The maximum statutory penalty for a violation of Title 21, United States Code, Sections 331(a) and 333(a)(2) is: not more than three years of imprisonment, a

fine of not more than $250,000, or both a fine and imprisonment; a $100 special

assessment; and a term of supervised release of not more than one year.

15.     If probation or supervised release is imposed, a violation of any condition

of probation or supervised release may result in a separate prison sentence and

additional supervision.

## IV.  COLLATERAL CONSEQUENCES

16.     The conviction may cause the loss of civil rights, including but not limited

to the rights to possess firearms, vote, hold elected office, and sit on a jury.  The

conviction may also carry with it significant immigration consequences including

removal and deportation, depending on the defendant's status within the United States.

## V.  STIPULATION OF FACTS

17.     The parties agree that there is a factual basis for the guilty plea the

defendant will tender pursuant to this plea agreement.  That basis is set forth below.

Because the Court must, as part of its sentencing methodology, compute the advisory

guideline range for the offense of conviction, consider relevant conduct, and consider

the other factors set forth in Title 18, United States Code, Section 3553, additional facts

may be included below that are pertinent to those considerations and computations.  To

the extent the parties disagree about the facts set forth below, the stipulation of facts

identifies which facts are known to be in dispute at the time of the execution of the plea

agreement.

18.     This stipulation of facts does not preclude either party from hereafter presenting the Court with additional facts that do not contradict facts to which the parties have stipulated and that are relevant to the Court's guideline computations, to other Section 3553 factors, or to the Court's overall sentencing decision.

19.     The parties agree that the date on which relevant conduct began is not later than September 2018.  The parties agree as follows:

The Defendant and the Regulated Drugs

20.     The defendant is a citizen of the People's Republic of China and resides in China.  Since approximately April 2016, and at all times relevant to the Indictment, the defendant was employed as a salesperson by the Chinese company, Xi'an Lyphar Biotechnology Co., Ltd. ("Lyphar").  According to the company website, Lyphar holds itself out as selling "plant extract and high technology chemical[s]."  Lyphar markets its products on international sales platforms and ships its products directly to the United States, including to Colorado.

21.     Many of the products Lyphar distributes are chemicals identified by the U.S. Food and Drug Administration ("FDA") as unapproved new drugs and chemicals that are sold as misbranded drugs.  Those products include selective androgen receptor modulators ("SARMs"), which are synthetic chemicals designed to mimic the effects of testosterone and other anabolic steroids, and nootropics, which are chemicals pedaled as "smart drugs" and marketed as "cognitive enhancers."  The FDA is responsible for enforcing the Federal Food, Drug, and Cosmetic Act ("FDCA"), a law intended to assure that drugs are safe, effective, and bear accurate labeling containing all required

8

information. The FDA regulates the manufacture, labeling, and distribution of all drugs shipped or received in interstate commerce.  In late October 2017, the FDA issued a public safety alert, warning consumers against ingesting products containing SARMs. More specifically, the FDA stated that the use of SARMs has been linked to life-threatening reactions, including liver toxicity, and that these products have the potential to increase the risk of heart attack and stroke, with the long-term effects on the body remaining unknown.

22.     Nootropics are chemicals that are often marketed as treating Alzheimer's Disease, Parkinson's Disease, heart disease, and cancer.  In February 2019, the FDA sent twelve official warning letters and five online advisory letters to companies selling nootropics.  The FDA stressed in its public statement that the products have not been proven safe and/or effective and could potentially prevent a person from seeking medical help for a serious medical condition.  One popular nootropic is Tianeptine. According to the FDA, companies make unlawful and illegal claims about Tianeptine, including that it treats opioid use disorder, pain, and anxiety. In November 2018, the FDA issued warning letters to two companies for the illegal marketing of Tianeptine labeled as dietary supplements, following reports to the FDA of serious adverse events associated with the use of products containing Tianeptine.  In April of 2018, Michigan's governor signed legislation that made Tianeptine a schedule II drug, putting it in the same category in Michigan as opioids, cocaine, and other highly restricted drugs.

Undercover Purchases of Unapproved New Drugs and Misbranded Drugs

23.     In September 2018, a FDA Special Agent working in an undercover capacity sent an e-mail to the contact e-mail address listed on internet sales sites for Lyphar.  The agent identified himself as a gym owner who had been providing SARMs and nootropics to his customers and was interested in purchasing the products from Lyphar.  The agent also stated that he had "been having trouble getting some of the products through US Customs with other suppliers, but I am reading on your Facebook that you have a [U.S.] warehouse. Could you provide any information on how to order and what exactly you have available?"  That same day, in response to this e-mail, the agent received an e-mail from an individual identifying himself as "James," the defendant.  The defendant stated that Lyphar is "China [sic] biggest Sarms/Nootropic/Tianeptine Vendor."  He attached a product and price list to the e-mail. In response to the agent's concerns regarding U.S. Customs, the defendant stated that Lyphar had a warehouse in the United States to which they shipped their products before distribution to customers, which avoided "Customs issues."

24.     U.S. Customs and Border Protection is a federal agency that works with FDA at the border to ensure that illegal FDA-regulated products are not imported into the country.  More specifically, Customs has the discretionary authority to seize, inter alia, packages containing FDA-regulated products that violate the FDCA.  *See* 19 U.S.C. § 1595a(c)(2)(A).  In addition, Customs has implemented a regulation that explicitly allows for FDA examination and sampling of FDA-regulated articles in informal entries like those at issue in this case.  *See* 19 C.F.R. § 151.4(a).

25.     On September 21, 2018, the FDA agent acting in an undercover capacity conducted a recorded call with the defendant.  The defendant stated he would send documents explaining what SARMs would do for the user, as well as information including dosage.   The defendant also advised the undercover agent to use a high risk credit card processing company.

26.     Immediately following this phone call, the defendant e-mailed a document, "SARMs Information," to the undercover agent.  At a later date, the agent was provided with a "Lyphar – Nootropics" document.  These document listed the uses, side effects, benefits, dosing, and mechanism of action for the drugs[1] charged in the Indictment, including Andarine (S-4), identified in Count 2.  The drugs identified in these documents, as charged in the Indictment, are "unapproved new drugs" as defined by law based on the claims made for each product.  That is, the chemicals are "drugs" because the documents state that the products are used to treat a disease or affect the "structure or function of the body of man."  21 U.S.C. § 321(g)(1)(B), (C). Specifically for Andarine (S-4), charged in Count 2 of the Indictment, the document: states that the drug can "preserve and improve lean body mass," "can prevent enlarged breasts in men, and help boost overall health"; provided dosing instructions; and stated that "[t]aking S4 daily

---

[1] The SARMS identified in the Indictment are: Andarine (S-4), LGD-4033, Ostarine, MK-677, RAD140, GW501516, and S-23.  The nootropics identified in the Indictment are: Tianeptine, Phenibut, Oxiracetam, Aniracetam, IDRA-21, and Noopept.  All of the drugs identified in the Indictment appear in one of the two Lyphar product documents that provide use and dosage information except Tianeptine, which was not identified in the "Lyphar – Nootropics" document.  In a phone call with the undercover agent, however, the defendant told the agent that Tianeptine was used to treat depression and was very popular in the United States.

for the length of the cycle can lead to changes in eyesight" and that customers should take "2 days off" to "avoid vision side effects." Further, the drugs listed in the "SARMs Information" document, including Andarine (S-4) are not "dietary ingredients" and, therefore, are not "food" as specified in the "drug" definition for products that affect the structure and function of the body "other than food." The drugs are unapproved because they were not the subjects of FDA-approved marketing applications as required by Title 21, United States Code, Section 355(a), and were not otherwise exempt from such FDA-approval requirements.

27.     Beginning in October 2018, the undercover agent made four undercover buys of numerous products from Lyphar through the defendant, as follows:

| Undercover Purchase # | Date Order Placed | Products Ordered and Delivered | Cost of Drug[2] |
|---|---|---|---|
| 1 | October 9, 2018 | Tianeptine, 1 kilogram | $3000 |
| 2 | October 25, 2018 | Andarine (S-4), 100 grams | $300 |
| | | LGD-4033, 50 grams | $500 |
| | | Ostarine, 100 grams | $300 |
| | | MK-677, 100 grams | $1,300 |
| | | RAD140, 20 grams | $360 |
| | | GW501516, 20 grams | $120 |
| 3 | February 6, 2019 | Phenibut HCL, 1 kilogram | $195 |
| | | Tianeptine Sodium, 1 kilogram | $3,000 |
| | | Oxiracetam, 1 kilogram | $3,000 |
| | | Aniracetam, 1 kilogram | $185 |
| | | IDRA-21, 100 grams | $500 |

[2] In addition to the cost of the product, the agent also paid shipping fees and wire fees associated with the payments to Lyphar.

| | | Noopept, 1 kilogram | $290 |
|---|---|---|---|
| | | S-23, 100 grams | $600 |
| 4 | August 29, 2019 | Ostarine, 100 grams | $300 |
| | | GW501516, 100 grams | $500 |
| | | Tianeptine, 100 grams | $380 |
| | | Andarine (S-4), 100 grams | $350 |
| | | Phenibut, 3 kilograms | $585 |
| | | Noopept, 1 kilogram | $290 |
| | | Oxiracetam, 3 kilograms | $405 |
| | | Aniracetam, 3 kilograms | $555 |

**TOTAL DRUG COST:  $17,015**

28.     All of the products were shipped either from Florida or China and delivered to Colorado within days to weeks after the agent placed the order.  The FDA's Forensic Chemistry Center tested all of the products and confirmed they were in fact the chemicals ordered.

Details Regarding Undercover Purchase #2:

29.     On November 1, 2018, the defendant sent an e-mail to the agent that stated the following regarding some of the products in the October 25, 2018 order: "S4(100g)---labels as ARA; OST(100g)+LGD(50g)---labels as chitosan, you can recognized them via weight (50g and 100g); MK677 (100g)---labels as Reveratrol." The "S4" identified here is the Andarine charged in Count 2 of the Indictment.  During an undercover operation in Las Vegas about one week later (discussed below), in which the undercover agent met with the defendant, the agent asked the defendant what he meant by this e-mail. The defendant stated he had to change the name of the products

to get them through U.S. Customs, but the agent would be able to tell which products were in each package based on their weights.

30.     The first four products from the October 25 order arrived packaged in four silver bags inside a single box, which identified the sender as a cosmetics company located in China, even though the products were not cosmetics.  The bags were labeled as described in the November 1 e-mail, as follows: (1) ARA Powder, 100g, (2) Resveratrol, 100g, (3) Chitosan, 100g, and (4) Chitosan, 50g. The package contained Material Safety Data Sheets for Arachidonic Acid, Chitosan, and Resveratrol. According to the FCC's testing, however, each of the products was, in fact, the drug the agent had ordered.   Each of these products, therefore, including the Andarine (S-4) charged in Count 2, was misbranded, because they were not identified with the proper name, rendering the labeling "false . . . in any particular."  Additionally, none of the products came with any directions for use, also rendering the products misbranded. The defendant caused the Andarine to be shipped interstate, from Florida to Colorado, and the product prior to that had been shipped from Lyphar in China to Florida.  The defendant intended to defraud governmental agencies involved in the regulation of drugs and consumer protection, that is, the FDA and U.S. Customs, by concealing the true name of the product by labeling it as a different chemical, and labeling it as a cosmetic product when it was not.

31.     On November 15, 2018, the agent asked about the last two products he had ordered on October 25 but had not come in the prior shipment (GW501516 and RAD140).  The agent asked if the defendant changed the names to something else so

14

they would get through Customs.  The defendant replied, "We write name as cosmetic

product . . . GW---Type 1; RAD140—Type 2. Transfer is a bit slow. Not arrive in US till

now…normally is 13-17 days arrived in US."  The package arrived approximately two

weeks later, identified as "Cosmetic Product" from China. Inside, a silver bag contained

a sealed white plastic bottle. Inside the bottle were two plastic sealed bags, marked

"Type 1" and "Type 2."  FCC tested and identified the products as the chemicals

ordered.  Because the products were not labeled with their correct name, the products

are misbranded. The products came with no directions, and therefore are also

misbranded because they did not bear adequate directions for use.

      Details Regarding Undercover Purchase #3:

      32.    On February 26, 2019, the defendant  sent an e-mail to the undercover

agent that stated he was sending certain of the the products labeled as different

substances, as follows: "Noopept labels as N-1 phenylacetyl… 1 kg aniracetam(inside

marked as 95%)+1 kg oxiracetam(inside marked as 98%)+100g IDRA (inside marked

99%)---labels as Glutathione packed in one package No matter how % we marked, Its

purity is always over 98% standard, most of time is 99%. % is help you recognize it."

On April 19, 2019, the defendant e-mailed that the 100 grams of S-23 SA Allgeyer

ordered would be coming in a container marked "White Kidney Bean Extract." These

products arrived labeled as stated in the e-mails and did not bear the correct name of

the drug.  They also came with no directions for use. For these reasons, the drugs were

misbranded.

Details Regarding Undercover Purchase #4

33.    The fourth undercover purchase is not charged in the Indictment.

34.    On September 29, 2019, the defendant sent the agent an e-mail regarding the August 29, 2019, order, that stated the following:

> Hello . . . , we received your payment. Here is the tracking, please kindly confirmed all products is same as its batch and name, It is very important to check it before usage:
>
> 1157515161220
>
> 3kg phenibut---marked as 4-amino-3-phen....batch number: LY20190606
>
> 100g tianeptine sodium---marked as 7-[(3-CHLOR0-6,11-DIHYDR0-6-METHYLDIBENZO[C,F][1,2]THIAZEPIN-11-YL)AMINO]HEPTANOATE S,S-DIOXIDE SODIUM.batch number: LY20190815
>
> 100g S4---marked as kava extract, batch number: LY190620KV
>
> 100g OST•CMarked as 7-[(3-CHLOR0-6-METHYL-5,5-DIOXID0-6,11-DIHYDRODIBENZO[C,F][1,2]THIAZEPIN-11-YL)AMINO]HEPTANOIC ACID batch number: LY20190518
>
> 100g GW501516, Marked as 7-[(3-CHLOR0-6-METHYL-5,5-DIOXID0-6,11-DIHYDRODIBENZO[C,F][1,2]THIAZEPIN-11-YL)AMINO]HEPTANOIC ACID batch number: LY20190524.

35.    Thus, the e-mail states that the products will be identified only by their long chemical names or, for three products, that they will be identified as a different product to conceal the true nature of the products.

36.    The defendant sent another e-mail regarding additional products from the fourth undercover purchase on September 19, 2019.  The e-mail states that the products aniracetam, oxiracetam, and noopept will be identified by their long chemical names.

Undercover Meeting with the Defendant

37.     November 7 and 8, 2018, the undercover agent and another FDA agent acting in an undercover capacity met with the defendant and his supervisor at the Supply Side West Exhibition in Las Vegas, Nevada.  This exhibition occurs annually and, according the Supply Side West website, brings together "[r]esources for health & nutrition professionals from the dietary supplement, food, beverage, personal care and sports nutrition industries."  Lyphar representatives typically attend the exhibition each year to market their products and meet U.S. customers.  On November 7, 2018, the agents recorded a meeting with the defendant.  The defendant showed the agents a document on his computer of Lyphar's major products, including SARMs, Tianeptine, and CBD. When asked about issues with Customs, the defendant stated, "We take all the risk." Regarding the November 1, 2018, SARMs order, in which the products were labeled with different names, the defendant stated, "we cannot import to United States legally, so we have to change the product's name for this."

38.     On November 8, 2018, the agents visited the exhibition. They met with the defendant at Lyphar's booth.  The Lyphar booth included no pictures or lists of products that were nootropics or SARMs.  No other booths at the exhibition identified such products for sale either.

## VI.   ADVISORY GUIDELINE COMPUTATION AND 3553 ADVISEMENT

39.     The parties understand that the imposition of a sentence in this matter is governed by Title 18, United States Code, Section 3553.  In determining the particular sentence to be imposed, the Court is required to consider seven factors. One of those

factors is the sentencing range computed by the Court under advisory guidelines issued by the United States Sentencing Commission.  To aid the Court in this regard, the parties set forth below their estimate of the advisory guideline range called for by the United States Sentencing Guidelines.  To the extent that the parties disagree about the guideline computations, the recitation below identifies the matters which are in dispute.

40.     The guideline calculation below is the good-faith estimate of the parties, but it is only an estimate.  The parties understand that the government has an independent obligation to assist the Court in making an accurate determination of the correct guideline range.  To that end, the government may make legal or factual arguments that affect the estimate below.

A.     The parties agree that the applicable Chapter 2 guideline for felony misbranding charges is Section 2B1.1 because the offense requires an intent to defraud.  See U.S.S.G. Statutory Index (referencing Sections 2N2.1 and 2B1.1 for violations of 21 U..S.C. § 333(a)(2)); U.S.S.G. § 2N2.1(c)(1) (directing use of Section 2B1.1 where the offense "involved fraud"); United States v. Ihenacho, 716 F.3d 266, 276 (1st Cir. 2013) (holding district court properly applied Section 2B1.1, rather than 2N2.1, based on charge in indictment alleging misbranding count was carried out  "with intent to defraud and mislead").  The base offense level is 6. U.S.S.G. § 2B1.1(a)(2).

B.     Four offense levels should be added because the fraud amount is more than $15,000 but less than $40,000.  Id. § 2B1.1(b)(1)(C).

C.     Two offense levels should be added because a substantial portion of the fraud was conducted outside the United States. Id. § 2B1.1(b)(10).

18

D.      The adjusted offense level should be 12.

E.      Pursuant to Section 3E1.1(a), and assuming continued acceptance of responsibility, the defendant should receive a two-level reduction for acceptance of responsibility. The resulting offense level is 10.

F.      The parties understand that the defendant's criminal history computation is tentative.  The criminal history category is determined by the Court based on the defendant's prior convictions.  Based on information currently available to the parties, it is estimated that the defendant's criminal history category would be I.

G.      The career offender/criminal livelihood/armed career criminal adjustments would not apply.

H.      The advisory guideline range resulting from these calculations is 6 to 12 months of imprisonment.  However, in order to be as accurate as possible, with the criminal history category undetermined at this time, the offense level estimated above could conceivably result in a range from 6 months (bottom of Category I) to 30 months (top of Category VI).

I.      Pursuant to guideline Section 5E1.2, assuming the estimated offense level above, the fine range for this offense would be $4,000 to $40,000, plus applicable interest and penalties.

J.      Pursuant to guideline Section 5D1.2, if the Court imposes a term of supervised release, that term should be not more than one year.

41.     The parties understand that although the Court will consider the parties' estimate, the Court must make its own determination of the guideline range. In doing so, the Court is not bound by the position of any party.

42.     No estimate by the parties regarding the guideline range precludes either party from asking the Court, within the overall context of the guidelines, to depart from that range at sentencing if that party believes that a departure is specifically authorized by the guidelines or that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the United States Sentencing Commission in formulating the advisory guidelines. Similarly, no estimate by the parties regarding the guideline range precludes either party from asking the Court to vary entirely from the advisory guidelines and to impose a non-guideline sentence based on other Section 3553 factors.

43.     The parties understand that the Court is free, upon consideration and proper application of all of the Section 3553 factors, to impose that reasonable sentence which it deems appropriate in the exercise of its discretion and that such sentence may be less than that called for by the advisory guidelines (in length or form), within the advisory guideline range, or above the advisory guideline range up to and including imprisonment for the statutory maximum term, regardless of any computation or position of any party on any Section 3553 factor.

## VII.   ENTIRE AGREEMENT

44.     The agreement disclosed to the Court is the entire agreement.  There are no other promises, agreements (or "side agreements"), terms, conditions,

understandings, or assurances, express or implied.  In entering this agreement, neither

the government nor the defendant has relied, or is relying, on any other terms,

promises, conditions, or assurances.


Date:  _____          _____
                             Yaguang Qi
                             Defendant


Date:  _____          _____
                             Lawrence Hill
                             Attorney for Defendant


Date:  _____          _____
                             Anna Edgar
                             Assistant United States Attorney